UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:10-CV-00016-JHM

JOHNEY E. FINN, Administer
of the Estate of Shannon Ray Finn, et al.,                                    PLAINTIFFS

V.

WARREN COUNTY, KENTUCKY, et. al.                                    DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendant Dr. John Adams' Motion for Summary
Judgment [DN 108]; Defendants William Baker, Greg Martin, Tom Maxwell, Derrick Sanders, Chad
Whitaker, Allen White, Jackie Strode and Warren County's (collectively the "County Defendants")
Motion for Summary Judgment [DN 110]; and Defendants Leah Price, Cheryl Wilson, and Southern
Health Partners (collectively the "SHP Defendants") Motion for Summary Judgment [DN 113]. As
well as Plaintiffs Johney E. Finn, as Administrator of the Estate of Shannon Ray Finn, and Sandra
Roddy's, as Guardian of the minor children of Shannon Ray Finn, S.N.F., J.W.F., and G.R.F.,
Motions for Leave to File Sur-Reply [DN 125, 130]. Fully briefed, these matters are ripe for
decision.

## I. BACKGROUND

Beginning January 1, 2004, Defendant Warren County, Kentucky contracted with Defendant
Southern Health Partners ("SHP") to provide medical services to inmates and pretrial detainees
housed at the Warren County Regional Jail ("WCRJ"). At some point thereafter, SHP contracted
with Defendant John Adams M.D. to serve as the Medical Director for the facility. Part of
Defendant Adams' responsibilities as Medical Director for the 500+ inmate facility included the
development of medical policies for the WCRJ; the review, approval and support of treatment

protocols, formularies, and policies established by SHP; and the facilitation of the education of all medical staff members regarding the applicable policies and procedures.

To that end, Defendant Adams created and instituted a standing protocol to be administered to inmates experiencing alcohol detoxification.  This protocol includes administering several types of withdrawal medication as well as the initiation of an Alcohol/Drug Withdrawal Flow Sheet Form.  Furthermore, the Flow Sheet is to be reviewed either by Dr. Adams or by one of his two Nurse Practioners, presumably during the weekly rounds.  Along with this protocol, SHP maintained its own policy on intoxication and withdrawal, which states in pertinent part:

> Detoxification will be carried out only under medical supervision and initiated by the medical staff with physician overview on an individual care basis. All detainees found to be demonstrating the signs and symptoms of drug/alcohol withdrawal will either be seen or reviewed by the Medical Director and his ordered care treatment plan will be followed. Inmates experiencing severe, life threatening intoxication or withdrawal must be seen by the Medical Director and upon his orders may be transferred to a licensed acute care facility, or the local emergency room for treatment. In life-threatening situations, immediately have the patient sent to the local ER for treatment.
>
> Detox inmates must be monitored on a consistent basis and all findings charted in his/her medical record. Documentation of the patient's status during detoxification is very important and must be reviewed by all medical staff members when needed in order to maintain patient care while incarcerated. Use the Alcohol and Drug Detox Flow Sheet.
>
> Correctional officers must be made aware of inmates placed on a detox program so they too will be able to monitor the patient for signs and symptoms of withdrawal distress.

(SHP's Policy and Procedure Manual for Health Services in Jails, § J-G-06.)

In addition to the above described protocol and policy, the WCRJ had its own policy regarding alcohol withdrawal.  Under the WCRJ Emergency Medical Services Policy ("EMS Policy"), alcohol withdrawal is considered a medical emergency and requires the officer confronted with the situation to administer first aid and call the EMT, doctor, or nurse to relay the emergency

information.  (See Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J., Ex. 1, Emergency Medical Services

Policy [hereinafter EMS Policy].)  The EMS Policy further requires the officer to move the inmate

to a holding cell when necessary and/or possible and to comply with the nurse, doctor, or EMT's

instructions.  (Id.)

On March 17, 2009, Shannon Ray Finn was arrested and booked into the WCRJ on a fugitive

warrant for a probation violation.  During intake, Finn completed a Medical/Mental Health

Screening Questionnaire, which included the following questions: Do you have a serious medical

condition that may require attention while you are here? Have you ever experienced DTs or other

serious withdrawal from drugs or alcohol?  In response to each of those questions, Finn answered

"No."  Finn was placed in a cell with several other detainees and was acting "fine" until the evening

of March 18, when he starting shaking and sweating.  It is unclear when, but on either March 17 or

18,  Finn was started on the standing detox protocol and began receiving medication.  It is also

unknown who authorized this action as it was not documented.  Furthermore, whoever began him

on the protocol failed to begin a Alcohol/Drug Withdrawal Flow Sheet.

At approximately 4:00 p.m. on March 19, a Flow Sheet was started for Finn by Nurse Karen

Hitson.  She recorded Finn's vital signs and noted that he was weak, restless, shaky/muscle

twitching, anxious, and unsteady (ataxia).  At 8:00 p.m., Finn was administered his detox

medication.  Then, at approximately 11:00 p.m. during "count," Finn requested to be seen by

medical.  Defendant Deputy Jailer Chad Whitaker escorted Finn to medical where he was seen by

Defendant Nurse Leah Price.  Nurse Price was first told about Finn's detoxification during "report"

between 6:30 p.m. and 7:00 p.m. earlier that evening.  At 7:30 p.m., she became the only medical

care provider at the WCRJ.  When Finn arrived in medical, at approximately 11:30 p.m., Nurse Price

took his vitals and recorded them on his Flow Sheet.  She further noted that Finn was again weak, restless, shaky/muscle twitching, anxious, and unsteady (ataxia).  Nurse Price noted that the vitals were in line with the previous examination and were within a generally accepted normal range.  Nevertheless, she suggested to Finn that he be transferred to a medical observation cell, but Finn did not wish to be placed in a cell alone.  He wanted to stay in a cell with the general population.  Therefore, after he was seen by Nurse Price for approximately twenty minutes, he was escorted back to his original cell.

From that point on, Finn began acting erratically.  Not only was he sweating profusely and shaking heavily, but his cellmates describe him as being delusional and hallucinating.  Some of the behavior that Finn began exhibiting included him seeing his girlfriend across the cell, attempting to use a card to open the cell door as if it were a hotel room door, and attempting to urinate on another cellmate believing that he was standing in a bathroom.  As Finn's behavior became more erratic, he and his cellmates attempted to get the deputy jailers' attention by banging and kicking on the cell door and throwing items at the speaker in the cell.

The deputy jailers responded several times to Finn's cell in response to the banging and kicking of the door.  The response from the deputy jailers regarding Finn's status was simply that medical was aware of his condition.  Defendant Captain William Baker began his shift as supervisor of the WCRJ at 11:00 p.m.  Upon beginning his shift, he was informed that Finn was on a detox protocol and that medical was aware of his situation.  Captain Baker had no contact with Finn until approximately 4:30 a.m. on March 20, when he and Deputy Jailer Whitaker responded to another round of banging and kicking emanating from Finn's cell.

When Captain Baker and Deputy Jailer Whitaker came to Finn's cell they found him to be

"very delirious."  Finn repeatedly asked the two jailers to let him out of the cell, and he did not understand that the jailers "couldn't just let him out."  Deputy Jailer Whitaker testified that "I think [Finn] wasn't quite sure where he was."  At this point, Captain Baker decided to move Finn to an isolation cell near booking.  Captain Baker and Nurse Price have testified that once Finn was moved into the isolation cell at 4:30 a.m., Nurse Price took Finn's vital signs and found them to be normal.  However, contrary to SHP policy, Nurse Price did not make an entry of this assessment in Finn's Flow Sheet.

The WCRJ policy for detainees in isolation cells requires that checks be conducted on the detainee every fifteen (15) to twenty (20) minutes.  These checks are conducted by various deputy jailers and recorded on an observation sheet.  Each time a check was conducted of Finn, the observing deputy jailer documented his observation as "appears to be ok."  Nurse Price also testified that between 6:15 a.m. and 6:30 a.m. that she checked on Finn and took his vital signs, observing that they were within the normal range.  However, she again failed to mark her assessment on Finn's Flow Sheet.

At 7:00 a.m., the morning shift arrived at the WCRJ.  Nurse Price was relieved by Defendant Nurse Cheryl Wilson.  Nurse Price gave Nurse Wilson a verbal report on Finn, advising her that Finn was withdrawing from either alcohol or drugs and was ill and shaking quite a bit during the night.  She further advised Nurse Wilson that he had been moved to an observation/isolation cell so that he could be monitored by the deputies every ten (10) to fifteen (15) minutes.  Based on this information, Nurse Wilson placed Finn's name on the list of inmates to be seen that morning, and gave that list to the deputy jailers.

Defendants Captain Greg Martin, Deputy Jailer Allen White, Deputy Jailer Tom Maxwell,

5

and Deputy Jailer Derrick Sanders also began their shifts at the WCRJ at 7:00 a.m.  Captain Baker advised Captain Martin that Finn had been moved to an observation/isolation cell and was detoxing. Deputy Jailer White was the booking officer for the first shift on March 20, and he had also been told that Finn was detoxing.  When Deputy Jailer White first observed Finn at 7 a.m., he noticed that Finn looked drunk and was shaking, and each time that he observed Finn after that, Finn was shaking.  Nevertheless, he noted on the observation sheet that Finn "appeared to be ok."

Finn was again administered his detox medication at 8 a.m. by a medication aide.  The deputy jailers continued to check on Finn and mark his condition as "appears to be ok."  At 9:56 a.m., Deputy Jailer Maxwell observed Finn on his knees, with his hands on his face, mumbling and shaking.  Concerned about Finn, he asked Deputy Jailer White why Finn was in observation, to which White responded that Finn was detoxing and was being monitored by medical staff.  Deputy Jailer Maxwell entered his observation on the sheet as "appears to be ok."  It is undisputed that after Finn was placed in the observation/isolation cell at 4:30 a.m., none of the deputy jailers' observations regarding his status were ever relayed to either Nurse Price or Nurse Wilson.

At 10:41 a.m. on March 20, Deputy Jailer White observed Finn's head lying in a puddle of blood and yellow liquid approximately three feet across.  Deputy Jailer White immediately called Captain Martin to request the key to Finn's cell.  Captain Martin summoned Deputy Jailer Sanders, a former EMT, and Nurse Wilson and then observed the scene.  Defendants Sanders and Wilson performed CPR until the medical center EMS arrived.  These efforts were unsuccessful and Finn was pronounced dead shortly thereafter.  The Kentucky Chief Medical Examiner performed an autopsy and determined that the cause of death "was attributed to delirium tremens arising as a result of ethanol withdrawal in the setting of chronic ethanolism."

Thereafter, Plaintiff Johney E. Finn, Administrator of the Estate of Shannon Ray Finn, initiated the instant action. An Amended Complaint was filed adding as a plaintiff, Sandra Roddy, Guardian of Shannon Ray Finn's minor children, S.N.F., J.W.F., and G.R.F. The First Amended Complaint alleges claims under 42 U.S.C. § 1983 against the Defendants in their individual and official capacities for their violation of Finn's Eight, Tenth, and Fourteenth Amendment Rights, and under Kentucky state law for the torts of negligence, gross negligence, and outrage. All Defendants have now moved for summary judgment.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will

7

be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

### III. DISCUSSION

As an initial matter, Plaintiffs have raised the issue of what evidence may be considered by the Court in ruling on the respective Defendants' motions for summary judgment. Plaintiffs contend that the Court should not consider the deposition testimony of the Defendants in determining whether summary judgment is appropriate because it is self-serving testimony that the jury is not required to believe. In support of this argument, Plaintiffs cite Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) for the proposition that "'the court should give credence to the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes *from a disinterested witness*.'" (Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J. 22 (quoting Reeves, 530 U.S. at 151) (emphasis added by Plaintiffs).) Plaintiffs essentially contend that the Court should disregard all non-favorable deposition testimony because there are no disinterested witnesses to corroborate the Defendants' stories.

The Sixth Circuit Court of Appeals has addressed this issue in Almond v. ABB Industrial Systems, Inc., 56 F. App'x 672, 675 (6th Cir. 2003). In Almond, the court found that an interpretation, such as the one proposed by Plaintiffs in the instant case, "both over-reads Reeves and leads to absurd consequences." Id. The court found that under certain circumstances, the testimony of the movant's interested witnesses can be considered by a court on summary judgment. Id. "In particular, '[t]he testimony of an employee of the [movant] must be taken as true when it disclosed no lack of candor, the witness was not impeached, his credibility was not questioned, and the accuracy of his testimony was not controverted by evidence, although if it were inaccurate it

8

readily could have been shown to be so.'" Id. (quoting 9A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 2527, at 287 n.9).  Discussing Almond's holding, the Sixth Circuit

found that "courts need not deny the conclusiveness of testimony of the moving party that 'is not

contradicted by direct evidence, nor by any legitimate inferences from the evidence[,]' because the

rule requiring that testimony be considered by the jury is not 'an absolute and inflexible one.'"

Stratienko v. Cordis Corp., 429 F.3d 592, 598 (6th Cir. 2005) (quoting Chesapaeake & Ohio Ry. v.

Martin, 283 U.S. 209, 218 (1931)).  Accordingly, the issue "is not whether the district court [can]

consider the affidavits of [interested witnesses] but instead whether the affidavits [are]

uncontradicted."  Id.

Applying the holdings of Almond and Stratienko, the Court finds that the Plaintiffs' general

request that no weight be given to the self-serving testimony of the respective Defendants is

inappropriate.  Instead, the Court will address the admissibility of the Defendants' testimony on an

individual basis as necessary.

## A. Federal Claims

Plaintiffs' federal claims for damages arise under 42 U.S.C. § 1983 which states in part that

[e]very person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United
States . . . to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law. . . .

42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff must establish "both that 1)[ ]he was

deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation

was caused by a person acting under color of state law."  Redding v. St. Eward, 241 F.3d 530, 532

(6th Cir. 2001) (citation omitted).  Plaintiffs contend that the Defendants violated Finn's Eighth,

Tenth, and Fourteenth Amendment rights.  The Eighth Amendment imposes a duty upon prison

officials to provide humane conditions of confinement.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Prison officials must "ensure that inmates receive[ ] adequate food, clothing, shelter, and *medical care*, and must 'take reasonable measures to guarantee the safety of the inmates.'"  Id. at 832–33 (citation omitted) (emphasis added).  "The Eighth Amendment prohibition against cruel and unusual punishment applies to pretrial detainees through the Fourteenth Amendment's Due Process Clause."  Davis v. Brian, 182 F.3d 916, at *3 (6th Cir. 1999) (table decision).

As Finn was a pretrial detainee at the time of his detention in the WCRJ, the Plaintiffs' claims are properly brought under the Fourteenth Amendment's Due Process Clause.  A pretrial detainee's constitutional rights are violated when a state actor is deliberately indifferent to the serious medical needs of the detainee.  Ford v. Cnty. of Grand Traverse, 535 F.3d 483, 494–95 (6th Cir. 2008).  To establish that a prison official, in his individual capacity, was deliberately indifferent to a detainee's serious medical needs, the plaintiff must establish two elements.  See Comstock v. McCrary, 273 F.3d 693, 702–03 (6th Cir. 2001).  The first element is an objective element, which requires a plaintiff to show that the detainee's medical needs were "sufficiently serious."  Id. (citing Farmer, 511 U.S. at 834).  The second element is a subjective element, which is satisfied if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.  "Complaints of malpractice or allegations of negligence are insufficient to entitle a plaintiff to relief."  Lewis v. McClennan, 7 F. App'x 373, 375 (6th Cir. 2001) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).  Furthermore, "[a] prisoner's difference of opinion regarding treatment does not rise to the level of an Eighth Amendment violation, . . . and, where the prisoner has received some medical attention and now

disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law." Id. (citing Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)) (internal citation omitted). However, "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." Westlake, 537 F.2d at 860.

The Court finds that Plaintiffs have produced sufficient evidence to demonstrate the objective element of their deliberate indifference claim against the individual defendants. The Sixth Circuit Court of Appeals has "recognized that delirium tremens constitutes a serious medical need" sufficient to satisfy the objective prong of a deliberate indifference claim. Bertl v. City of Westland, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (unpublished) (citing Speers v. Cnty. of Berrien, 196 F. App'x 390, 394 (6th Cir. 2006)). While Defendants' experts may contend that Finn was not suffering from delirium tremens, Plaintiffs' expert as well as the coroner who conducted Finn's autopsy have opined that Finn did in fact suffer from delirium tremens. Taking the facts in the light most favorable to the Plaintiffs, the evidence demonstrates that Finn suffered from a serious medical need. The question to be addressed on an individual basis is the subjective prong of the deliberate indifference standard, namely whether the Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Finn, and that each drew that inference and then disregarded the risk.

**1. Claims of Deliberate Indifference against the Deputy Jailers**

The deputy jailers have moved for summary judgment on Plaintiffs' deliberate indifference claim contending that they are entitled to qualified immunity. "Under the doctrine of qualified

11

immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Miller v. Sanilac Cnty., 606 F.3d 240, 247 (6th Cir. 2010) (quoting Phillips v. Roane Cnty., 534 F.3d 531, 538 (6th Cir. 2008)). The burden is on the Plaintiffs to prove that Defendants are not entitled to qualified immunity by demonstrating that a constitutional right was violated and that the right was clearly established at the time of the violation.  Scott v. Harris, 550 U.S. 372, 377 (2007); Pearson v. Callahan, 555 U.S. 223 (2009).  The Court's analysis of the alleged facts is undertaken in the light most favorable to the party asserting the injury. Ammex, Inc. v. Durant, 381 Fed. App'x 482, 485 (6th Cir. 2010). Furthermore, the Court may address these two prongs in whichever order it sees fit.  See Pearson, 555 U.S. at 236.

The Court will first address whether the right at issue was clearly established.  For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Ammex, 381 Fed. App'x at 485 (quotation omitted).   In cases regarding incarcerated individuals suffering injuries during detoxification, the Sixth Circuit has found that the right at issue is the right to medical treatment for a serious medical need and that this right has been clearly established since 1987. See Preyor v. City of Ferndale, 248 F. App'x 636, 645 (6th Cir. 2007).  Therefore, the Court finds that Finn's constitutional right to medical treatment was "clearly established" at the time of his death in 2009.

The Court will now determine whether Plaintiffs have demonstrated the presence of a constitutional violation.  This determination will be made on an individual basis among the deputy jailers.  As an in initial matter, the Court must address the deputy jailers' use of the term "DTs."

Although certain of the deputy jailers sometimes referred to Finn as suffering from "DTs," their testimony reveals that they used this term to indicate that someone was suffering from withdrawal generally, not from the life-threatening condition that is actually known as delirium tremens. Accordingly, the fact that a deputy jailer referred to Finn as suffering from "DTs," in and of itself, does not demonstrate that the deputy jailer actually knew that Finn was suffering from a serious medical condition.  See Speers, 196 F. App'x at 394–95 (acknowledging prison employees' use of "DTs" as shorthand for "alcohol withdrawal," and finding that without more, a prison employee's statement that the decedent was suffering from "DTs" was insufficient to demonstrate that the employee was aware that the decedent was suffering from a serious medical condition").

### a. Captain William Baker

Defendant Captain William Baker was the third shift supervisor for the WCRJ and began his shift on August 19, at 11:00 p.m.  At the start of his shift, he was informed that Finn had been placed on the detox protocol.  Captain Baker's next interaction with Finn occurred at 4:30 a.m. when he and Deputy Jailer Whitaker responded to Finn and his cellmates banging and kicking on their cell door.  When Captain Baker saw Finn, he was sweating and shaking, and was confused and "very delirious."  Captain Baker and Deputy Jailer Whitaker removed Finn from his cell and placed him in an observation cell, "little six," near the medical unit.  Captain Baker notified Nurse Price that he was moving Finn to "little six," and shortly thereafter, Nurse Price arrived to check on Finn. However, Captain Baker failed to tell Nurse Price that Finn was acting "very delirious."

The observation log for Finn's cell indicates that Captain Baker checked on Finn twice more during his shift, at 5:27 a.m. and 6:28 a.m.  Each time, Captain Baker instructed Finn to get up, get a drink of water, and then sit back down.  Instructions that Finn followed both times.  During both

of these observations, Finn was still sweating and shaking heavily, but Captain Baker noted in the observation log that Finn "appeared to be ok."  During the shift change, Captain Baker informed Defendant Captain Greg Martin that Finn was on detox protocol and that he had been removed from general population and placed in "little six."

While the evidence is sufficient to demonstrate that Captain Baker subjectively perceived facts from which to infer a substantial risk to Finn's health and safety, it is insufficient to demonstrate that Captain Baker disregarded those facts.  When Captain Baker observed Finn's condition at 4:30 a.m. on March 20, he found him sweating, shaking, and "very delirious." However, Captain Baker did not disregard Finn's condition, but instead placed him in a medical observation cell, notified Nurse Price, and remained in "little six" until Nurse Price arrived and examined Finn.  Following these actions, Captain Baker checked on Finn twice more during his shift, during which time Finn was sufficiently cognizant to respond to Captain Baker's instructions. At the end of his shift, Captain Baker notified his replacement Captain Martin of Finn's status and placement in "little six."  See Speers, 196 F. App'x at 396 (finding that similar response by an officer failed was not deliberate indifference because the officer had responded reasonably to the risk).

Plaintiffs contend that Captain Baker violated the Jail's EMS Policy and that this violation demonstrates his reckless disregard for Finn's health or safety.  However, the EMS policy is anything but a model of clarity.  Quite simply it orders that in the case of alcohol withdrawal or a life threatening situation that the officer shall administer first aid if necessary, notify a nurse, doctor, or EMT and relay the emergency information, place the inmate in isolation, and then comply with the nurse, doctor or EMT's instructions.  In the instant case, Captain Baker performed all of these

14

actions with the exception of relaying all of the information of which he had knowledge.  However, Plaintiffs have argued and the Court has found that Nurse Price was aware of Finn's confusion and delirium at 4:30 a.m.  (See infra Part III.A.2.a.)  Accordingly, the Court finds Captain Baker's failure to advise Nurse Price of a fact that the Court has charged Nurse Price with observing on her own, does not demonstrate a reckless disregard for Finn's health and safety.

The facts demonstrate that Captain Baker observed Finn's condition, recognized it as requiring attention, and responded reasonably.  On these facts, no reasonable jury could find that Captain Baker ignored the serious risk to Finn's health and safety.  Thus Plaintiffs' have failed to demonstrate a constitutional violation.  Under these circumstances, Captain Baker is entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **GRANTED**.

### b. Deputy Jailer Chad Whitaker

Defendant Deputy Jailer Chad Whitaker worked the third shift at WCRJ on August 19 and 20 from 11:00 p.m. until 7:00 a.m.  While he was conducting count at approximately 11:30 p.m., Finn requested to be taken to medical.  Deputy Jailer Whitaker took him to see Nurse Price who assessed Finn's condition and recorded his vital signs in the Flow Sheet.  Finn was returned back to his cell shortly thereafter.  At approximately 1:00 a.m., Deputy Jailer Whitaker responded to Finn's cell after hearing Finn and his cellmates banging and kicking their cell door.  Deputy Jailer Whitaker observed Finn shaking and sweating heavily.  It is unclear if medical was alerted regarding the 1:00 a.m. incident with Finn.  Deputy Jailer Whitaker and Captain Baker responded to Finn's cell again at 4:30 a.m. and observed Finn sweating, shaking, and in a confused and delirious state.  Deputy Jailer Whitaker then helped Captain Baker escort Finn to the medical observation cell.

Deputy Jailer Whitaker left "little six" before Nurse Price arrived and thus was unaware if Nurse Price actually checked on Finn's condition.

Deputy Jailer Whitaker had contact with Finn on only one more occasion. At 4:58 a.m., he conducted the scheduled observation of Finn's cell. He saw Finn up on his own power and moving around, but displaying the same behavior as when he had helped him to medical at 4:30 a.m. During this check, Finn asked Deputy Jailer Whitaker to remove the window from the cell so that Finn could get out. At 4:58 a.m., Deputy Jailer Whitaker marked Finn's observation log "appears to be ok."

Unlike Captain Baker, there is no evidence that Deputy Jailer Whitaker was aware that Finn was actually seen by Nurse Price when he was transferred to the isolation cell at 4:30. Furthermore, when he observed Finn at 4:58, he knew that Finn was still exhibiting delirium and/or confusion, as well as heavy sweating and shaking. Rather than engage him in conversation to see if he could follow commands, as Captain Baker had, Deputy Jailer Whitaker merely observed Finn's condition and then noted "appears to be ok." On these facts, a reasonable jury could find that Deputy Jailer Whitaker was aware of a serious risk to Finn's health and safety and disregarded that risk. Under these circumstances, Deputy Jailer Whitaker is not entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **DENIED**.

### c. Captain Greg Martin

Defendant Captain Greg Martin was the first shift supervisor at the WCRJ on August 20, and began his shift at 7:00 a.m. At the start of his shift, he was informed by Captain Baker that Finn was on the detox protocol and had been moved to isolation in "little six." Captain Martin conducted the scheduled observation of Finn's cell at 7:28 a.m. He does not recall anything about Finn's condition

16

or physical location at that time, but the observation log demonstrates that he listed Finn as "appears to be ok." Captain Martin's next encounter with Finn occurred at 10:41 a.m. when he was called to open Finn's cell by Deputy Jailer Allen White who had discovered Finn slumped over in a puddle of yellow body fluid and blood. Captain Martin immediately requested that Deputy Jailer Sanders come to Finn's cell, on account of his EMT training, and contacted Nurse Wilson in medical. Captain Martin then observed the scene until EMS arrived.

Plaintiffs do not take issue with Captain Martin's actions after Finn's discovery at 10:41 a.m. Instead they contend that he was deliberate indifferent to Finn's health and safety during the 7:28 a.m. observation check. Plaintiffs contend that circumstantial evidence supports the inference that at 7:28 a.m. Finn was sweating profusely, shaking badly, and very delirious when he was observed by Captain Martin. Yet, despite his knowledge that Finn was suffering from withdrawal, Captain Martin did not open the cell door, engage Finn in conversation, or report his observations to Nurse Wilson. Instead, Finn simply wrote down "appears to be ok" on the observation log.

In Speers, the Sixth Circuit found that where officers knew a detainee was exhibiting severe symptoms during alcohol withdrawal, there existed "a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage Speers verbally or entered his cell." Speers, 196 F. App'x at 397–98. In the instant case, Finn's cellmates have described in great detail the extreme nature of Finn's shaking, sweating, and delirium immediately before he was removed to "little six." The evidence in the light most favorable to Plaintiffs demonstrates that Finn's condition did not improve, but in fact worsened into the morning of August 20, that Defendant Captain Martin knew that Finn was suffering from withdrawal, and that he in fact observed Finn sweating, shaking, and delirious. Nevertheless,

17

Captain Martin did not report his observation to medical, did not enter Finn's cell, and did not even attempt to engage Finn in conversation. On these facts, a reasonable jury could find that Captain Martin was aware of a serious risk to Finn's health and safety and that he disregarded that risk by failing to do more than passively look into Finn's cell and record Finn's condition as "ok." Under these circumstances, Captain Martin is not entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **DENIED**.

### d. Deputy Jailer Tom Maxwell

Defendant Deputy Jailer Tom Maxwell began his first shift duty at the WCRJ at 7:00 a.m. on August 20. Deputy Jailer Maxwell had only one encounter with Finn prior to his death, which occurred at 9:56 a.m. during a scheduled observation check. When Deputy Jailer Maxwell checked on Finn, he found Finn kneeled down with his hands on his face, mumbling and shaking. Concerned by this display, Deputy Jailer Maxwell asked Defendant Deputy Jailer Allen White why Finn was in "little six." Deputy Jailer White informed Deputy Jailer Maxwell that he was in "little six" for medical observation because he was detoxing. Thereafter, Deputy Jailer Maxwell simply entered the following phrase on Finn's observation log: "appears to be ok."

The facts in the light most favorable to Plaintiffs demonstrate that Deputy Jailer Maxwell was aware that Finn was suffering from withdrawal, that he witnessed him on his knees with his face buried in his hands, mumbling and shaking. Yet, Deputy Maxwell did not alert medical regarding this observation, did not attempt to enter his cell, or even attempt to engage Finn in conversation. Deputy Jailer Maxwell simply listed his observation of Finn as "appears to be ok," when in reality, Finn would be dead in forty-five minutes. On these facts, a reasonable jury could find that Deputy Jailer Maxwell was aware of a serious risk to Finn's health and safety and disregarded that risk.

18

Under these circumstances, Deputy Jailer Maxwell is not entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **DENIED**.

### e. Deputy Jailer Allen White

Defendant Deputy Jailer Allen White was the first shift booking officer at the WCRJ on August 20. He began his shift at 7:00 a.m. and was informed by the third shift booking officer that Finn was in "little six" under medical observation. Deputy Jailer White first observed Finn at 7:00 a.m. and saw him shaking, but not sweating. He remembered that Finn was standing up, but that he looked drunk. Deputy Jailer White initialed Finn's observation log and noted that he "appears to be ok." Deputy Jailer White checked on Finn again at 7:58, 8:23, 8:37, 9:32, 10:11, and 10:26. Each time that Deputy Jailer White observed Finn he was shaking and at some point during the morning, he observed Finn on his knees shaking. At no point did Deputy Jailer White advise medical of Finn's condition, attempt to converse with Finn, or do anything other than note on the observation log that Finn "appears to be ok." When Deputy Jailer White conducted the 10:41 check of Finn, he discovered Finn on the floor of his cell, with his head lying in a puddle of blood and yellow liquid. The last entry on Finn's observation log, entered by Deputy Jailer White at 10:41, simply says "appears to be ok."

Deputy Jailer White testified that when he conducts an observation check, he is really only trying to verify that the inmate is breathing and moving around, and "a twitch is moving around." He further testified that when someone from medical places an inmate in medical observation, the inmate becomes medical's issue. This testimony regarding Deputy Jailer White's perception of his role in observing detainees like Finn, coupled with the fact that on multiple occasions he observed

19

Finn shaking, mumbling, and on his knees but did nothing demonstrates that Deputy Jailer White was aware of a serious risk to Finn's health and safety and chose to disregard that. Under these circumstances, Deputy Jailer White is not entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **DENIED**.

### f. Deputy Jailer Derrick Sanders

Defendant Deputy Jailer Derrick Sanders came on duty at 7:00 a.m. at the WCRJ on March 20. His only interaction with Finn occurred at approximately 10:41 a.m. when Captain Martin called him to Finn's cell, where he helped perform CPR. There is no evidence that Deputy Jailer Sanders was aware of Finn's condition prior to being called to his cell by Captain Martin. Therefore, he could not have been aware of a serious risk to Finn's health and safety, nor could he have disregarded that risk. Furthermore, "Plaintiffs have already agreed to not contest the dismissal of Defendant Derrick Sanders from this case." (Pls.' Surreply to the Cnty. Defs.' Mot. for Summ. J. 2.) Under these circumstances, Deputy Jailer Sanders is entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **GRANTED**.

### g. Jailer Jackie Strode

Plaintiffs have produced no evidence that Defendant Jailer Strode was aware of Finn's condition, that he perceived any risk to his health and safety, or that he disregarded that risk. Under these circumstances, Jailer Strode is entitled to qualified immunity and his motion for summary judgment in his individual capacity as to the deliberate indifference claim is **GRANTED**.

### 2. Claims of Deliberate Indifference against the SHP Nurses and Dr. Adams

### a. Nurse Leah Price

20

Defendant Nurse Leah Price contends that summary judgment in her favor is appropriate because there is no evidence that she acted with knowledge or deliberate ignorance of a substantial risk to Finn's health.  The evidence, taken in the light most favorable to Plaintiffs is as follows: Defendant Nurse Price was advised at 6:30 p.m. on March 19, that Finn was withdrawing from alcohol and was on the standing detox protocol.  She was told that a Flow Sheet had been initiated for him and that he was experiencing some tremors but that his vitals were within normal limits.

At 11:30 p.m. Finn was brought to medical, sweating and shaking heavily, where Nurse Price assessed Finn noting he was weak, restless, sweating, shaking, anxious, and unsteady; took his vitals; and recorded this information on his Flow Sheet.  At 4:30 a.m., Captain Baker made the decision to place Finn in "little six," notifying Nurse Price along the way that Finn was being moved.  Captain Baker and Nurse Price have testified that Nurse Price assessed Finn but failed to record any of her observations on his Flow Sheet.  Nurse Price contends that Finn's vitals were normal, but admits that he complained of being drowsy and nauseous.  While Nurse Price contends that Finn was not confused at this time, the evidence in the light most favorable to Plaintiffs demonstrates otherwise.  It can be inferred from Finn's cellmates' testimony as well as the testimony of Deputy Jailer Whitaker and Captain Baker that at the time of this assessment, Finn was "very delirious" and confused, which appears to be one of the reasons that Captain Baker decided to place Finn in a medical observation cell.  If Nurse Price did in fact assess Finn at 4:30 a.m., as she contends that she did, then a reasonable jury could infer that Nurse Price witnessed this same delirious behavior.

Nurse Price contends that she visited Finn again at 6:30 a.m. and conducted another assessment that demonstrated normal vital signs, but again failed to record any of her findings.

Unlike the 4:30 a.m. assessment, which was corroborated by Captain Baker, there is no evidence that the 6:30 a.m. assessment actually occurred outside of Nurse Price's testimony, and Plaintiffs' have demonstrated that a legitimate inference can be drawn that this assessment did not in fact happen. Accordingly, the Court will disregard this fact under the holding of Reeves. See Reeves, 530 U.S. at 151.

Nurse Price knew that alcohol withdrawal could develop into delirium tremens, and that such a development could be life-threatening. She further knew that the symptoms of such a development included tremors, sweats, possible delirium, slurred speech, abnormal vital signs, weakness, and dizziness, and that Finn was exhibiting several of these symptoms. Given Finn's condition at 4:30 a.m., and the fact that Nurse Price claims to have conducted an assessment, there are sufficient facts to demonstrate that Nurse Price was aware of facts from which it could be inferred that a substantial risk of serious harm existed, and that she did in fact draw that inference.

The evidence further demonstrates that Nurse Price disregarded that serious risk. Nurse Price was aware that Finn was exhibiting characteristics of a life-threatening nature, yet she did nothing more than allow Finn to be placed in an isolation cell to be checked on by deputy jailers every 15-20 minutes. Although he was exhibiting life-threatening symptoms and his condition had deteriorated from his 11:30 p.m. assessment, she did not contact the Medical Director or send him to the E.R. as required by SHP policy J-G-06 and the Alcohol Withdrawal Flow Sheet. (See SHP Defs.' Mot. for Summ. J., Ex. F, Flow Sheet ("If patient experiences changes or deterioration is noted, notify your Physician *immediately*[.]") (emphasis added)); See also Harris v. City of Circleville, 583 F.3d 356, 369 (considering a defendant's failure to follow policy as evidence that the subjective prong of a deliberate indifference claim had been satisfied). She also failed to follow

22

SHP policy by not recording her 4:30 a.m. assessment of Finn on his Flow Sheet.  Nor did she advise the deputy jailers of the signs and symptoms of delirium tremens for which they should be watching.  On these facts, a reasonable jury could find that Nurse Price was aware of a serious risk to Finn's health and safety and disregarded that risk.  Therefore, Nurse Price's motion for summary judgment in her individual capacity as to the deliberate indifference claim is **DENIED**.

### b. Nurse Cheryl Wilson

Defendant Nurse Cheryl Wilson came on duty at the WCRJ at 7:00 a.m. on August 20.  While it is unclear if Nurse Wilson actually saw Finn's Flow Sheet, she testified that she would normally have seen a Flow Sheet like Finn's within an hour of her arrival at the facility.  Thus, it can be inferred that she did see Finn's Flow Sheet and was aware of the noted symptoms.  Furthermore, Nurse Price gave Nurse Wilson an oral report of Finn's condition at approximately 7:00 a.m.  Nurse Price informed Nurse Wilson that Finn was on detox protocol because he was withdrawing from either drugs or alcohol.  Nurse Wilson learned that Finn had been "shaking quite a bit during the night" so he was moved to a medical observation cell where he could be watched every 10-15 minutes by the deputy jailers.  Based upon this information, Nurse Wilson placed Finn's name on the list of inmates to be seen that morning.  However, Nurse Wilson did not see Finn prior to 10:41 a.m. when she was called to his cell by Captain Martin.  At no point did any of the deputy jailers discuss their observations of Finn with Nurse Wilson, nor did the medication aid who administered Finn's detox medication at 8 a.m. inform Nurse Wilson of any troubling signs or symptoms that Finn might have been displaying.[1]

_____

[1] Plaintiffs contend that under <u>Reeves</u> evidence that the medication aides administered medication to Finn but did not report any symptoms to Nurse Wilson should be disregarded.  However, this fact is supported and corroborated by Finn's medication administration chart, (<u>see</u>

Taking these facts in the light most favorable to Plaintiffs, there is insufficient evidence to demonstrate that Nurse Wilson was aware of a serious risk to Finn's health and safety and made the conscious choice to disregard that risk.  Unlike Nurse Price, who had seen Finn on at least two occasions and was aware of his physical state, including his confusion and delusions, Nurse Wilson had not seen Finn and was not aware of any delusional or odd behavior.  She was aware that Finn was detoxing and that he had experienced shaking, but those are signs of normal alcohol withdrawal and without more do not convey a serious risk to Finn's health and safety.  The fact that Nurse Wilson was aware that Finn was detoxing but failed to check on him in the first three hours and forty-one minutes of her shift may demonstrate poor professional judgment, but it is not enough to demonstrate that Nurse Wilson was deliberately indifferent.  See Stefan v. Olson, 2011 WL 2621251, at * 11–12 (N.D. Ohio July 5, 2011) (finding no deliberate indifference where a nurse failed to check on an inmate for three hours at the beginning of her shift even though she knew that the decedent was withdrawing, but was unaware that he had exhibited more severe symptoms).  On these facts, no reasonable jury could find that Nurse Wilson was aware of a serious risk to Finn's health and safety and disregarded that risk.  Therefore, Nurse Wilson's motion for summary judgment in her individual capacity as to the deliberate indifference claim is **GRANTED**.

### c. Dr. Adams

Defendant Dr. John Adams, the Medical Director at the WCRJ, has moved for summary judgment contending that he is not a state actor and that Plaintiffs have failed to satisfy the subjective prong of their deliberate indifference claim.  Dr. Adams contends that he is not a state

---

SHP Defs.' Mot. for Summ. J., Ex. 5,) and shall be considered under Almond.  See Almond, 56 F. App'x at 675.

24

actor for purposes of § 1983 because he is an independent contractor hired by an independent contractor, and is thus twice removed from the State. There are three tests under which a private entity may be deemed a state actor: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test. Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992). "'The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state.'" Tahfs v. Proctor, 316 F.3d 584, 591 (6th Cir. 2003) (quoting Ellison v. Garbarino, 48 F.3d 192, 195 (6th Cir. 1995)). As the Medical Director of the jail, charged with overseeing the administration of health care to all detainees incarcerated at the jail, it is clear that Dr. Adams was exercising powers traditionally exclusively reserved for the state. See West v. Atkins, 487 U.S. 42, 54 (1988). Accordingly, Dr. Adams is to be considered a state actor in the instant case. Next, Dr. Adams contends that he is entitled to summary judgment regarding Plaintiffs' deliberate indifference claim because there is no evidence that he perceived a serious risk to Finn's health and safety and then disregarded that risk. It is undisputed that Dr. Adams was unaware that Finn was incarcerated at the WCRJ until after he was declared dead. Dr. Adams argues that he could not have been deliberately indifferent to Finn's serious medical need since there is no evidence he was ever aware of Finn's serious medical need.

Plaintiffs contend that Dr. Adams "knowledge of a general threat to inmate safety is sufficient to support a finding of deliberate indifference even though he cannot know the 'specific' source of the problem." (Pls.' Resp. to Def. Adams' Mot. for Summ. J. 16.) Plaintiffs' citation for this proposition appears to be Terrance v. Northville Regional Psychiatric Hospital, 286 F.3d 834, 843 (6th Cir. 2002). Plaintiffs argue that Dr. Adams must have known that there was a serious risk to every inmate's health at the WCRJ because he was only contacted on average twice a month by

25

the jail.  Plaintiffs posit that Dr. Adams should have known that the nurses were not executing their duties in good faith, or he would have been contacted more frequently.  Thus, they contend, Dr. Adams was aware that every inmate's health was at serious risk from a lack of proper medical care.

While creative, this theory simply does not hold water.  That Dr. Adams was only contacted by the nurses on average twice a month is insufficient evidence to demonstrate that Dr. Adams knew the detainees at the facility were not receiving proper medical care.  Absent such knowledge, Dr. Adams could not have subjectively perceived a serious risk to Finn's health and safety.  Interestingly, in <u>Terrance</u>, the very case that Plaintiffs use to support this theory, the Sixth Circuit found that the defendant medical director at the facility who had no contact with the decedent, was entitled to summary judgment as to the plaintiff's deliberate indifference claim.  <u>See</u> <u>Terrance</u>, 286 F.3d at 846–47.  Therefore, Dr. Adams' motion for summary judgment in his individual capacity as to the deliberate indifference claim is **GRANTED**.

### 3. Supervisory Liability

#### a. Dr. Adams

Plaintiffs further argue that Dr. Adams is liable in his supervisory capacity.  Plaintiffs contend that Dr. Adams' implicitly authorized or at least acquiesced in "the nurses' custom and practice of diagnosing and treating inmates suffering from alcohol withdrawal without physician supervision, despite the fact that such practice fell well outside such nurses' legal scope of practice and violated SHP's written policies and procedures."  Plaintiffs' evidence of this authorization is the fact that Dr. Adams claimed to have diagnosed Finn through the nurses' use of the detox protocol, even though Dr. Adams was completely unaware of Finn's incarceration.

> "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability."

26

Miller v. Calhoun County, 408 F.3d 803, 817 n.3 (6th Cir. 2005).  "At a minimum,
a § 1983 plaintiff must show that a supervisory official at least implicitly authorized,
approved or knowingly acquiesced in the unconstitutional conduct of the offending
subordinate." Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).

Grinter v. Knight, 532 F.3d 567, 575 (6th Cir. 2008).  "When the plaintiff alleges supervisory

liability . . . based on creation of a policy or custom, the plaintiff must show that . . . the policy or

custom itself amounts to deliberate indifference on the part of the supervisory officials." Ronayne

v. Ficano, 173 F.3d 856 (table), 1999 WL 183479, at *1 (6th Cir.1999) (citing City of Canton v.

Harris, 489 U.S. 378, 388 (1989)). This requires proof that the supervisor "disregarded a known or

obvious consequence of his action." Id. at *3. In addition to establishing a policy that is deliberately

indifferent, a plaintiff must also show "'[a]n affirmative link between the occurrence of the . . .

misconduct and the adoption of any plan or policy-express or otherwise-showing [the supervisor's]

authorization or approval of such misconduct.'" Bock, 55 F. App'x at 311 (quoting Rizzo v. Goode,

423 U.S. 362, 371 (1976)); see also Miller, 408 F.3d at 815 (the plaintiff must prove that the policies

and practices "directly caused the constitutional violation.") (citation omitted).

It is the Plaintiffs' burden to demonstrate that the policy or custom amounts to deliberate

indifference and that the adoption of this policy directly caused Finn's death.  Plaintiffs have failed

to carry this burden.  Assuming that Dr. Adams' approved of the SHP nurses' diagnosing and

treating inmates without physician supervision, Plaintiffs have failed to demonstrate that such a

policy constitutes deliberate indifference.  Accordingly, the Court finds that Dr. Adams' motion for

summary judgment regarding supervisor liability is **GRANTED**.

### b. Jailer Strode and Warren County

Plaintiffs have alleged that Jailer Strode and Warren County may be held liable in a

supervisory capacity for permitting the deputy jailers to routinely disregard the Jail's policy deeming

27

alcohol withdrawal a medical emergency and the emergency response it required.  As Plaintiffs are complaining of Warren County and Jailer Strode's failure to act and to enforce the existing EMS Policy, this claim is actually that Warren County and Jailer Strode maintained a custom or policy of "inaction."  See Stefan, 2011 WL 2621251, at *14; Thomas v. City of Shaker Heights, 2006 WL 160303, at *6 (N.D. Ohio Jan. 20, 2006).  In the Sixth Circuit, a claim of "inaction" requires that a plaintiff satisfy a four-part test.  Cain v. Irvin, 2007 WL 2023581, at *11 (W.D. Ky. July 10, 2007) (citing Doe v. Claiborne Cnty., 103 F.3d 495, 508 (6th Cir. 1996)).  A plaintiff must demonstrate: (1) the existence of a clear and persistent pattern of unconstitutional conduct by employees; (2) notice or constructive notice on the part of the municipality; (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the municipality's custom was the "moving force" or direct causal link in the constitutional deprivation. Id.

In the instant case, Plaintiffs have failed to satisfy either the first or the second prong of this test.  Plaintiffs have produced the testimony of various deputy jailers that alcohol withdrawal is a common occurrence in the jail setting, that it is normal to see detainees shaking and sweating heavily while suffering from withdrawal, and that such observations are not cause for concern.  Plaintiffs argue that this creates an inference that rarely are such observations relayed back to medical as required by the EMS Policy.  This evidence is insufficient to demonstrate the existence of a clear and persistent pattern of constitutional violations.  Assuming this is satisfactory evidence that the deputy jailers routinely disregarded the jail's policy, Plaintiffs have failed to produce evidence that the failure to follow the policy reflected a pattern of constitutional violations.  See Berry, 25 F.3d at 1354 (noting that violations of a city police department's policy are not necessarily violations of

28

the Constitution).  That the deputy jailers rarely relayed to medical personnel their observations of detainees suffering from alcohol withdrawal is unsettling.  However, absent evidence that the deputy jailers were disregarding a sufficiently serious risk by failing to follow the policy, there is insufficient evidence that such failures were constitutional violations.

In Speers, the Sixth Circuit distinguished between delirium tremens, which constitutes a serious medical condition for purposes of deliberate indifference analysis, and non-life threatening alcohol withdrawal.  Speers, 196 F. App'x at 395.  As Plaintiffs have only produced evidence that the deputy jailers routinely failed to report observations of alcohol withdrawal, a condition not deemed a serious medical condition under Sixth Circuit precedent, there is insufficient evidence that the failure to follow the policy resulted in constitutional violations.  Without such evidence, Plaintiffs cannot succeed on this theory of liability.  Notwithstanding, the Court notes that Plaintiffs have also failed the second prong, as they have produced no evidence that Warren County or Jailer Strode were on notice of the deputy jailers' failure to follow this policy.

It is unclear, but it appears that Plaintiffs are also seeking to hold Warren County and Jailer Strode liable for SHP employees' failure to follow SHP's own policies and procedures.  Plaintiffs argue that Warren County and Jailer Strode "have the primary and absolute responsibility for ensuring that inmates of the Jail receive the medical care required by Kentucky's statutes and regulations and the Jail's own policies, and are primarily liable if they fail to do so."  (Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J. 21.)  Plaintiffs contend, therefore, that Warren County and Jailer Strode are liable for the actions and omissions of SHP, its nurses, and its Medical Director, Dr. Adams.  In support of this claim, Plaintiffs cite Taylor v. Michigan Department of Corrections, 69 F.3d 76, 81 (6th Cir. 1995) which held:

> In the instant case Foltz is charged with abandoning the specific duties of his position-adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers-in the face of actual knowledge of a breakdown in the proper workings of the department. A jury could find on the facts that Foltz personally had a job to do, and that he did not do it.

Id. at 81.

The Sixth Circuit has made clear that "[a] local government 'cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.'" Johnson v. Hardin Cnty., 908 F.2d 1280, 1285 (6th Cir. 1990) (quoting Monell, 436 U.S. at 691). To the extent that Plaintiffs believe Warren County and Jailer Strode are liable simply because the WCRJ employed SHP, and certain employees of SHP may have been deliberately indifferent, they are clearly mistaken.

The Court also finds that liability under the approach espoused in Taylor is inappropriate in the instant case. In Taylor, the plaintiff produced evidence that the defendant abandoned the duties of his position "in the face of actual knowledge of a breakdown in the proper workings of the department." Taylor, 67 F.3d at 81. Plaintiffs in the instant case must produce evidence that Warren County and Jailer Strode abandoned their duties of providing necessary medical care to inmates, in the face of actual knowledge that SHP was failing to do so. Plaintiffs have not directed the Court to any evidence of record that demonstrates that either Warren County or Jailer Strode had actual knowledge that there was a breakdown in the medical care of the inmates at the WCRJ as a result of SHP, its employees, or Dr. Adams' failure to follow policies and procedures. See, e.g., Samples v. Logan Cnty., 2006 WL 39265, at *7–8 (S.D. Ohio Jan. 6, 2006) (finding liability under Taylor inappropriate because plaintiff had failed to provide evidence that the defendants "knew of and disregarded any problems with the jail's policy[,]" and then "failed to perform their duties in the face

30

of an actual breakdown in jail policy.")  Accordingly, the Court finds that Warren County and Jailer Strode are entitled to summary judgment regarding this theory of supervisory liability.

Plaintiffs next argue that Warren County and Jailer Strode are liable for the deliberate indifference of SHP, its employees and Dr. Adams because they delegated final decision-making authority to SHP employees regarding medical decisions.  In support of this argument, Plaintiffs cite Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986) and St. Louis v. Praprotnik, 485 U.S. 112 (1988).  The Court finds this argument unpersuasive as well.  The Pembaur and Praprotnik decisions address when a municipality can be held liable for the decisions of policy makers.  In Pembaur, a majority of the Court noted that "[i]f the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."  Pembaur, 475 U.S. at 481.

However, "[t]he power of an official to make final decisions regarding questions involving a particular subject matter, in and of itself, is not necessarily enough to establish a local government's liability."  Johnson v. Hardin Cnty., 908 F.2d 1280, 1286 (6th Cir. 1990).  In Johnson, the plaintiff attempted to establish municipal liability by arguing that the jailer had been delegated final decision making authority over medical decisions, and thus his decisions reflected the official policy of the municipality.  Id. at 1285–86.  The Sixth Circuit held that "in order for [the plaintiff] to prevail under this theory, he must have produced evidence from which a jury could reasonably conclude that [the defendant] was vested with final authority to set medical treatment policy for the county's prisoners."  Id. at 1286.  The court found that "[a]lthough it is clear that [the defendant] applied policy by making decisions regarding [the plaintiff's] treatment, [the plaintiff] introduced no evidence that indicates [the defendant] is vested with authority to make all of the county's

medical *policy* decisions." Id. at 1287 (emphasis in original).

Thus, to prevail on this theory, Plaintiffs in the instant case must produce evidence that SHP and its employees were "vested with authority to make all of the county's medical *policy* decisions." Id. Similar to the facts in Johnson, Plaintiffs have produced evidence that SHP and its employees were the final decision-makers on medical *treatment* for the inmates at the WCRJ. However, Plaintiffs have failed to produce evidence that SHP was vested with authority to make *all* of the county's medical *policy* decisions. Accordingly, Warren County and Jailer Strode cannot be held liable for the decisions of the SHP Defendants because those decisions do not reflect the official policy of Warren County. As Plaintiffs have failed to produce sufficient evidence for any of their supervisory liability theories to survive summary judgment, Jailer Strode and Warren County's motion for summary judgment on these theories is **GRANTED**.

### c. Southern Health Partners

Plaintiffs also contend that Defendant SHP has supervisory liability for its Nurses' and Medical Director's deliberate indifference. The Sixth Circuit has held that in the § 1983 context a private corporation can be liable under theories similar to municipal liability. Street v. Corrections Corp. of Amer., 102 F.3d 810, 818 (6th Cir. 1996). However, the same limitations apply to a § 1983 suit against a private corporation as one against a municipality, namely that there is no respondeat superior or vicarious liability. See id.

Plaintiffs' supervisory claim against Defendant SHP is also based on the theory discussed in Taylor. Plaintiffs contend that "[a]s in Taylor, SHP had the responsibility to enforce, through appropriate training and supervision, policies and procedures that were intended precisely to protect someone in Finn's condition[,]" which it failed to do. The Court finds that Plaintiffs have failed to

produce evidence that SHP abandoned the specific duties of its position, providing adequate medical care to the detainees at the WCRJ, in the face of actual knowledge that there was a breakdown in such care.  See, e.g., Samples, 2006 WL 39265, at *7–8.  Accordingly, summary judgment in favor of Defendant SHP regarding Plaintiffs' supervisory liability claim is **GRANTED**.

### 4. Failure to Train Liability

#### a. Warren County and Jailer Strode

Plaintiffs have next alleged that Warren County and Jailer Strode should be held liable for their failure to train the deputy jailers to ensure that legally mandated health care is provided.  The Sixth Circuit has found that an attempt to hold an officer liable in his individual capacity for his "alleged failure to adequately train employees . . . 'improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability.'"  Harvey v. Campbell Cnty., 453 F. App'x 557, 563 (6th Cir. 2011) (quoting Phillips v. Roane Cnty., 534 F.3d 531, 543–44 (6th Cir. 2008)); see also Dillingham v. Millsaps, 809 F. Supp. 2d 820, 845 (E.D. Tenn. 2011) ("A general 'failure to train' claim has been routinely rejected by the Sixth Circuit in this context (trying to impose liability on a supervisor in his or her individual capacity).").  Rather, a failure to train claim against a defendant in his individual capacity is properly deemed to be a claim against that defendant in his official capacity.  See Heyerman v. Cnty. of Calhoun, 680 F.3d 642, 647–48 (6th Cir. 2012) (citing Miller, 408 F.3d at 817 n.3 for the proposition that "where there is an absence of evidence of personal involvement in the underlying misconduct, failure-to-train claims against individual defendants are properly deemed to be brought against them in their official capacities and are treated as claims against the county").  Therefore, to the extent this claim is alleged against Defendant Jailer Strode, the Court will interpret it as one against him in his official capacity.

33

Plaintiffs' specific complaint against Defendant Warren County is that "[n]one of the deputy jailers on duty on the morning of March 20, 2009, had received any training whatsoever on recognizing the signs and symptoms of alcohol withdrawal" nor had any such training ever been required or provided. (Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J., Ex. 14, Expert Report of Eugene Miller, at 2.) To succeed on a claim of failure to train Plaintiffs must establish (1) the Warren County training program was inadequate for the tasks the officers were required to perform; (2) the inadequacy was the result of Warren County's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir.1992).

Plaintiffs do not apply the three pronged test articulated in Russo to the facts of the instant case. Instead, Plaintiffs recite the facts of Stefan, 2011 WL 2621251 (N.D. Ohio July 5, 2011) and Thomas, 2006 WL 160303 (N.D. Ohio Jan. 20, 2006), and then argue that "[t]he parallels between the facts in Stefan and the facts in the instant case are obvious." (Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J. 33.) In Stefan, the court found that the jail's training was inadequate when the officers were required to monitor inmates on alcohol withdrawal but "the jail spent no money on training its corrections officers on how to deal with 1) intoxicated inmates, 2) alcohol withdrawal, 3) recognizing the signs and the symptoms of alcohol withdrawal or 4) assessing inmates at risk for seizures." Stefan, 2011 WL 2621251, at *15. In the instant case, the Court finds that Plaintiffs have produced sufficient evidence for a reasonable jury to find that the deputy jailers received inadequate training regarding the signs, symptoms, and dangers of alcohol withdrawal, and specifically delirium tremens. The deputy jailers testified that they had received no training on the signs, symptoms or dangers of alcohol withdrawal, and Jailer Strode testified that to his knowledge no one on his staff

had ever received any instruction, education, or training on alcohol withdrawal.

Defendants contend that each defendant deputy jailer received the sixteen (16) hours of annual training mandated by Kentucky regulations, demonstrating that they were adequately trained. However, Defendants have provided no proof regarding the subject or areas covered by the annual sixteen hours of training.  That the deputy jailers received the bare minimum training required by the state does not mean that they received adequate training in this particular area of jail administration.  If proof of completion of state required minimum training was sufficient to defeat a failure to train claim, such claims would virtually cease to exist.  Under these circumstances, the Court finds that proof of the successful completion of state mandated training alone is insufficient to demonstrate adequate training regarding the dangers of alcohol withdrawal in the prison setting. See Thomas, 2006 WL 160303, at *7 (rejecting similar argument that officers training was adequate because it was based on template provided by the state).  Given the testimony of the Defendants that alcohol withdrawal involving sweating and shaking was not an unusual occurrence in the jail, but the deputy jailers received no training regarding alcohol withdrawal, a reasonable jury could conclude that the training in this area was inadequate to the tasks that the deputy jailers were required to perform.

Plaintiffs have also produced sufficient evidence to satisfy the deliberate indifference prong. There are two situations that justify a conclusion that a municipality's failure to train was deliberately indifferent.  "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction."  Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999).  The other "is where the [municipality] fails to act in response to repeated complaints of constitutional violations by its officers."  Id.  Plaintiffs have produced no evidence

35

of repeated complaints regarding deputy jailers monitoring detainees suffering from alcohol withdrawal, therefore the failure to train claim must proceed under the first scenario.

The Supreme Court has held that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 409 (1997). One example of such a circumstance is a city's failure to train its police officers in the use of deadly force, because city officials know that their officers will need to use such force when attempting to arrest fleeing felons. See Canton, 489 U.S. at 390 n.10. In a jail setting, the failure of a medical care provider "to train medical personnel how to deal with medical emergencies relating to diabetes could foreseeably lead to terrible consequences, including death[,]" and thus satisfied this deliberate indifference standard. See Lawson v. Whitley Cnty., 2012 WL 300617, at *4 (E.D. Ky. Jan. 13, 2012).

In the instant case, the Court finds that Plaintiffs have produced "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." Brown, 520 U.S. 397, 409 (1997). The Jail's own EMS Policy acknowledges that alcohol withdrawal constitutes a medical emergency. None of the parties dispute that delirium tremens is a potentially fatal complication of alcohol withdrawal. Furthermore, the deputy jailer defendants have acknowledged that it is common for detainees to suffer from alcohol withdrawal while incarcerated at the WCRJ, yet they have received no training in this area. Under these circumstances, a reasonable jury could find that Warren County's failure to train its deputy jailers regarding the signs, symptoms, dangers and responses to alcohol withdrawal was the result of the

36

County's deliberate indifference.

The Court further finds that Plaintiffs have produced sufficient evidence that the inadequacy was related to or actually caused the injury to Finn. First, Plaintiffs' expert, Dr. Blondell, opined that Finn's "death was preventable had the deceased received appropriate medical care," and that part of the reason Finn did not receive appropriate care was a lack of proper monitoring. (See Pls.' Resp. to Cnty. Defs.' Mot. for Summ. J., Ex. 15, Blondell Expert Report.) Second, Plaintiffs' other expert, Mr. Miller, has opined that the deputy jailers failed to recognize the serious deterioration of Finn's condition and bring it to the attention of the medical personnel because "they had never been trained to recognize the signs of alcohol withdrawal, including the significance of the onset of delirium tremens." (Id., Ex. 14, Miller Expert Report.) This is sufficient evidence for a reasonable jury to find that the deputy jailers lack of adequate training regarding alcohol withdrawal was related to Finn's death from delirium tremens. Accordingly, summary judgment in favor of Defendant Warren County regarding the failure to train claim is inappropriate, and its motion on this issue is **DENIED**.

### b. Southern Health Partners and Dr. Adams

Plaintiffs also contend that Defendants Dr. Adams and SHP are liable for their failure to train the Nurses at the WCRJ. As discussed above, to the extent this claim is alleged against Dr. Adams the court will interpret it as one against him in his official capacity, making the proper party Defendant SHP. See Heyerman, 680 F.3d at 647–48. In support of this theory, Plaintiffs present the following evidence: Nurses at the WCRJ receive shadow training rather than specific orientation; Nurses Price and Wilson had not reviewed the WCRJ policies and procedures; and Nurses Price and Wilson violated various SHP policies. Plaintiffs contend that "[t]he fact that SHP's nurses violated

37

virtually every provision of SHP's policy on alcohol withdrawal speaks to their lacking [sic] of training, and SHP's resultant liability."

While there is evidence that Nurses Price and Wilson did indeed violate at least some of the applicable SHP policies, Plaintiffs have failed to present evidence that these violations were due to inadequate training. Unlike the evidence Plaintiffs presented regarding the deputy jailers' lack of training, the record is silent regarding the training received by Nurses Price and Wilson. It is Plaintiffs' duty to demonstrate the inadequacy of the training, and based upon the current record, the Court finds Plaintiffs have failed to carry that burden. Even if the Court were to assume that the Nurses' policy violations alone were sufficient to demonstrate inadequate training, Plaintiffs have also failed to present evidence that this lack of training was due to SHP's deliberate indifference. Thus, Plaintiffs would also fail to satisfy the second Russo prong. Accordingly, summary judgment in favor of Defendant SHP regarding Plaintiffs' failure to train claim is **GRANTED**.

### 5. Tenth Amendment Claim

Plaintiffs have also alleged a § 1983 claim premised on a violation of the Tenth Amendment. Defendants have moved for summary judgment on this claim contending that it does not provide a means for recovery in this action. See Rice v. Chandler, 2008 WL 1832214, at *3 (W.D. Ky. Apr. 22, 2008) (finding that in a deliberate indifference to medical needs context, "the Tenth Amendment provides no theory under which Plaintiff can recover for the injuries he asserts."). In their Response, Plaintiffs have failed to address this claim or the Defendants' argument. Therefore, the Court considers this claim to be waived, and the motion for summary judgment is **GRANTED**. See Ctr. for Biological Diversity v. Rural Utils. Serv., 2009 WL 3241607, at *3 (E.D. Ky. Oct. 2, 2009) ("When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the

lack of response is grounds for the district court to assume opposition to the motion is waived, and

grant the motion.") (citing Humphrey v. U.S. Attorney General's Office, 279 F. App'x 328, 331 (6th

Cir. 2008)).

**B. State Law Claims**

### 1. Outrage

Plaintiffs have alleged that each Defendant is liable for the common law tort of outrage.  In

Kentucky, this tort is also known as intentional infliction of emotional distress ("IIED").  See

Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 788 (Ky. 2004).  Kentucky considers the tort of

outrage to be a "gap-filler." Rigazio v. Archdiocese of Louisville, 853 S.W.2d 295, 298-99 (Ky. Ct.

App. 1993).  Thus, a claim of outrage is not a valid cause of action in Kentucky where the alleged

conduct makes out a claim for another tort for which emotional distress damages are available. Id.

The result is the general rule that an IIED or outrage claim cannot be pled by itself, in tandem with

another tort, or in the alternative as long as some other tort with adequate relief fits the facts.  See

Carter v. Porter, 2008 WL 4911142, at *5 (E.D. Ky. 2008) (dismissing IIED claim on 12(b)(6)

motion because malicious prosecution claim would potentially allow damages for emotional

distress); Martin v. Crall, 2007 WL 2083682, at *4–5 (W.D. Ky. July 18, 2007) (dismissing IIED

claim on summary judgment where plaintiff had alleged a § 1983 claim for deliberate indifference

to a serious medical need which allowed damages for emotion distress); see also Taylor v. Univ.

Med. Ctr., Inc., 2005 WL 1026190, at *3 (W.D. Ky. 2005) (dismissing IIED as a gap-filler tort while

simultaneously granting summary judgment on all other tort claims). The sole exception to this

general rule is where the alleged "actions or conduct are intended only to cause extreme emotional

distress in the victim."  Brewer v. Hillard, 15 S.W.3d 1, 8 (Ky. Ct. App. 2000).

In the instant case, Plaintiffs have alleged claims of deliberate indifference to a serious medical need as well as negligence and gross negligence. Because emotional distress damages are available for each of those claims, Plaintiffs' outrage claim is inappropriate unless Plaintiffs can produce evidence that the Defendants took the above actions "only to cause [Finn] extreme emotional distress[.]" Banks, 39 S.W.3d at 481. Plaintiffs have produced no such evidence. Accordingly, Summary Judgment in favor of all Defendants as to Plaintiffs' claim of outrage is **GRANTED**.

### 2. Negligence and Gross Negligence

Plaintiffs have also alleged negligence and gross negligence claims against each Defendant, and each Defendant, with the exception of Warren County, has moved for summary judgment on these claims asserting the defense of qualified official immunity. Under Kentucky law,

> Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions and judgment) and are made in good faith and within the scope of their authority or employment. This is intended to protect governmental officers or employees from liability for good faith judgment calls in a legally uncertain environment. An act is not "discretionary" merely because some judgment is used in deciding on the means or method used. However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith. The burden is on the plaintiff to show that the public official or employee was not acting in good faith. [Yanero v. Davis, 65 S.W.3d 510, 522–23 (Ky. 2001).]

Autry v. Western Ky. Univ., 219 S.W.3d 713, 717 (Ky. 2007).

The initial burden of establishing qualified official immunity rests with the public officer or employee and requires that he make a prima facie showing "that the act was performed within the scope of his/her discretionary authority." Yanero, 65 S.W.3d at 523. After such a showing, the burden then "shifts to the plaintiff to establish by direct or circumstantial evidence that the

discretionary act was not performed in good faith." Id.  The availability of qualified official immunity "rests not on the status or title of the officer or employee, but on the function performed." Jerauld ex rel. Robinson v. Kroger, 353 S.W.3d 636, 641 (Ky. Ct. App. 2011).  Accordingly, the Kentucky Court of Appeals has held that the defense of qualified official immunity is available to medical providers who are contracted to provide services to inmates at jail facilities.  See id. Because the demonstration of bad faith is occurring at the summary judgment stage, the facts are to be taken in the light most favorable to Plaintiffs.  Bryant v. Pulaski Cnty. Det. Ctr., 330 S.W.3d 461, 467 (Ky. 2011).

### a. Discretionary vs. Ministerial

Plaintiffs contend that qualified official immunity is inapplicable because the respective Defendants' actions were ministerial in nature, not discretionary.  "Discretionary acts are, generally speaking, 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" Haney v. Monsky, 311 S.W.3d 235, 240 (Ky. 2010) (quoting Yanero, 65 S.W.3d at 522).  "Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed."  Upchurch v. Clinton Cnty., 330 S.W.2d 428, 430 (Ky. 1959).  "It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." Haney, 311 S.W.3d at 240.

"On the other hand, ministerial acts or functions—for which there are no immunity—are those that require 'only obedience to the orders of others, or when the officer's duty is absolute,

certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" Id. (quoting Yanero, 65 S.W.3d at 522). "[T]hat a necessity may exist for the ascertainment of those facts does not operate to convert the act into one discretionary in its nature." Upchurch, 330 S.W.2d at 430. Furthermore, "an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means or method to be employed." Id. "[W]hat tends to demonstrate the ministerial nature of an act or function is an identifiable deviation from an 'absolute, certain, and imperative' obligation—whatever its source— such that it requires 'only obedience' or 'merely execution of a specific act from fixed and designated facts'" Haney, 311 S.W.3d at 245 (quoting Yanero, 65 S.W.3d at 522).

### i. County Defendants

Plaintiffs contend that Jailer Strode's and the deputy jailers' actions should be deemed ministerial because they had no other "option but to enforce and implement the Jail's policy deeming alcohol withdrawal a 'medical emergency.'" (Pl.'s Resp. to Cnty. Defs.' Mot. for Summ. J. 38.) Plaintiffs contend that the deputy jailers, who knew that Finn was experiencing alcohol withdrawal, were required to follow the EMS Policy, thus rendering their actions ministerial. Defendants cite Jerauld, 353 S.W.3d at 640–41, and contend that "determining whether an inmate is experiencing a medical emergency, then determining how to act is most certainly a discretionary function." (Cnty. Defs.' Reply 11.)

The EMS Policy requires an officer confronted with a medical emergency to take certain actions. Under the policy, alcohol withdrawal is defined as a medical emergency. Once it is determined that the inmate is experiencing a medical emergency, an officer is obligated to act in

accordance with the EMS Policy, rendering his actions ministerial.  That it is first necessary for an officer to ascertain that the inmate is experiencing alcohol withdrawal does not convert his actions into discretionary ones.  See Upchurch, 330 S.W.2d at 430.  As Defendants Baker, Martin, Maxwell, Whitaker, and White have all admitted that they knew Finn was experiencing alcohol withdrawal, their actions, thereafter, regarding Finn's supervision were controlled by the EMS Policy, and were ministerial in nature. It is this admission that distinguishes the instant case from the result in Jerauld.

In Jerauld, the Kentucky Court of Appeals rejected the plaintiff's argument that the medical officer and deputy jailer defendants were obligated to take specific actions in dealing with an inmate because the inmate was at risk for suicide.  Id. at 640.  The court found that "[i]t is important to note, however, that both [defendants] contend they did not believe [the inmate] to be at risk for suicide." Id. at 640–41.  In the instant case, because the deputy jailers have acknowledged their awareness that Finn was experiencing alcohol withdrawal, the result in Jerauld does not apply.  Accordingly, the deputy jailers' actions regarding Finn's supervision were ministerial in nature.[2]

As for Jailer Strode, Plaintiffs contend that his failure to enforce the EMS Policy was a ministerial action that is not entitled to qualified official immunity.  While the EMS Policy places affirmative obligations on officers confronted with a medical emergency ("the officer confronted with a medical emergency will . . ."), it does not speak to the Jailer's supervision of the Policy.  In Walker v. Davis, 643 F. Supp. 2d 921, 933–34 (W.D. Ky. 2009), this Court addressed a similar situation where the defendant sheriff had enacted a pursuit policy that was allegedly violated.  Id. at 933.  This Court found that the policy at issue charged the officers involved in the pursuit or

---

[2] The Court makes no ruling as to whether these Defendants in fact violated the EMS Policy, only that their actions were controlled by the EMS Policy, making them ministerial.

supervising the pursuit with an obligation, but that "the manner in which [the sheriff] supervises the pursuit policy is discretionary in nature." Id. at 934.  The Court agrees with the analysis in Walker and finds that Jailer Strode's actions regarding the supervision and enforcement of the EMS Policy were discretionary in nature.

### ii. SHP Defendants

Regarding Nurses Price and Wilson, Plaintiffs contend that they each had a duty "to follow policies that were intended to identify and address Finn's life-threatening condition" rendering their actions ministerial in nature.  Plaintiffs cite several policies that they contend the Nurses violated, including the requirement that all findings be charted in the inmate's medical record, that the Medical Director be contacted when an inmate's condition deteriorates, and failing to communicate with the deputy jailers' watching Finn in the observation cell.  Nurses Price and Wilson cite Jerauld and argue that their actions were discretionary.  Nurse Price contends that she used her discretion in evaluating Finn's actions and behavior, utilizing an "evaluation of alternatives, personal reflection and significant judgment," to determine Finn's needs and act upon her discretionary determinations.  Nurse Wilson contends that she used her discretion in evaluating Finn's condition pursuant to available information thereby placing his name on the list of inmates to be seen that day.

Regarding the failure of Nurse Price to notify the Medical Director of Finn's deteriorating condition, as required by SHP policy, this is the type of determination requiring "the exercise of professional expertise and judgment" that qualified official immunity was created to protect.  See Caneyville, 286 S.W.3d at 809 n.9; see also Turner v. Nelson, 342 S.W.3d 866, 877–78 (Ky. 2011) (finding a  teacher's actions discretionary where she had to make a reasonable inquiry into the facts, weigh the credibility of her students, and then use her judgment and experience as a teacher to reach

44

a decision).   While Nurse Price's determination may have been a poor one, it was still a discretionary one.

However, recording assessments and notifying the deputy jailers of Finn's condition do not require discretion, nor are they the type of actions that can be performed lawfully in one of two or more ways.   In this sense, these requirements more closely resemble the helmet requirement held to be ministerial in <u>Yanero</u>.   The Kentucky Supreme Court discussed why such requirements are deemed ministerial in <u>Turner</u>:

> Unlike the teacher's decision-making in this case, a helmet requirement constitutes "an essentially objective and binary directive."   <u>Haney</u>, 311 S.W.3d at 242 (discussing <u>Yanero</u>, 65 S.W.3d 510).  As a result, "[t]here is no substantial compliance with such an order and it cannot be a matter of degree: its enforcement was absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." <u>Id.</u> (citation omitted) (internal quotation omitted). You do it or you don't—and unlike here, there is no factual determination required for its application.

<u>Turner</u>, 342 S.W.3d at 876.   Similarly, the requirements to record assessments and notify deputy jailers about Finn's detoxification are binary directives, "you do [them] or you don't."   Therefore, the Court finds that these actions were ministerial in nature and do not afford Nurse Price qualified official immunity for negligence claims based on her failure to follow these policies.

As for Nurse Wilson, her decision to place Finn on a list of inmates to be seen and the order of the names on that list were discretionary actions by Nurse Wilson.   In hindsight, Nurse Wilson's failure to place Finn at the top of the list may have been a costly mistake, but it was still a decision that required Nurse Wilson to use her expertise and experience to analyze the information she had at the time to make a decision.   Therefore, the court finds that it was discretionary in nature and entitles Nurse Wilson to qualified official immunity.

Defendant SHP also requests qualified official immunity "for its actions in developing and

pursuing a course of action for treating the health issues of inmates at the Warren County Regional Jail." (SHP Defs.' Mot. for Summ. J. 18.) In <u>Autry</u>, the Kentucky Supreme Court held that a private corporation could avail itself of the defense of qualified official immunity. <u>See</u> <u>Autry</u>, 219 S.W.3d at 719. Furthermore, the development and implementation of policies is an inherently discretionary action. <u>See</u> <u>Williams v. Ky. Dep't of Educ.</u>, 113 S.W.3d 145, 150 (Ky. 2003) (finding the "promulgation of rules is a discretionary function"). Thus, the Court sees no reason why SHP's discretionary promulgation of policies does not entitle it to qualified official immunity in this case.

### iii. Dr. Adams

Lastly, regarding Dr. Adams, Plaintiffs contend that Dr. Adams' contract and SHP policies required the execution of certain duties, making the execution of those duties, or lack-there-of, a ministerial action. Plaintiffs argue that "Dr. Adams' abject failure to satisfy his contractual promises and his duties as a primary care physician to the inmates of the Jail, and his failure to implement and follow SHP's policies and procedures" caused Finn's death and make qualified official immunity inapplicable. Dr. Adams cites <u>Jerauld</u> and contends that the creation and implementation of medical policies is a discretionary action.

The Court agrees that the creation of policies for the care of the inmates at the WCRJ was an inherently discretionary function, entitling Dr. Adams to qualified official immunity for any claims of negligence in the design and implementation of such policies. <u>See</u> <u>Williams</u>, 113 S.W.3d at 150. However, to the extent that Plaintiffs have alleged claims of negligence against Dr. Adams for his failure to follow applicable SHP policies, namely § J-A-05, making him responsible for facilitating the education of all medical staff members of the applicable policies and procedures, the Court finds that this duty was a ministerial one not entitled to qualified official immunity. Although

46

the manner in which Dr. Adams' satisfied this duty was left to his discretion, "an act is not necessarily taken out of the class styled 'ministerial' because the officer performing it is vested with a discretion respecting the means or method to be employed." Upchurch, 330 S.W.2d at 430.

### b. Bad Faith

To the extent a Defendant's actions were deemed discretionary, Plaintiffs contend that the Defendant's deliberate indifference voids any qualified official immunity to which he or she might be entitled. Defendants argue that there is no deliberate indifference exception to qualified official immunity, and that only a demonstration of bad faith will negate qualified official immunity.

Under Kentucky law, "even if an act is discretionary, there is no immunity if it violates *constitutional*, statutory or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith." Autry, 219 S.W.3d at 717 (emphasis added). This has come to be known simply as "bad faith." In Rowan County v. Sloas, the Kentucky Supreme Court undertook an extensive discussion of "bad faith" in the context of qualified official immunity. See Sloas, 201 S.W.3d at 481–86. The court found that "as is most often the case, the establishment of 'bad faith' occurs upon proof of a violation of a 'clearly established right' of the plaintiff, which 'a person in the public employee's position presumptively would have known was afforded to a person in the [plaintiff's] position, *i.e.*, objective unreasonableness[.]'" Id. at 481 (quoting Yanero, 65 S.W.3d at 523).

In this respect, where a plaintiff attempts to negate state-law qualified official immunity by demonstrating bad faith through the violation of a constitutional right, the plaintiff's burden mirrors his burden for negating federal qualified immunity. See Russo, 953 F.2d at 1043 ("When a claim to qualified immunity is raised within the context of a motion for summary judgment, the

47

non-movant must allege facts sufficient to indicate that the act in question violated clearly established law at the time the act was committed.") The Court has already addressed these determinations above, but will recap them briefly.  See supra Part III.A.

Plaintiffs argue that the Defendants' deliberate indifference to Finn's serious medical needs was a violation of his Fourteenth Amendment right to due process, which was clearly established at the time of the violation.  First, the Court agrees that this right was clearly established at the time of the violation.  See Preyor, 248 F. App'x at 645.  Second, in its discussion of Plaintiffs' § 1983 claim, the Court found that the facts in the light most favorable to Plaintiffs demonstrated that Defendants Martin, Maxwell, Price, Whitaker, and White were deliberately indifferent to Finn's serious medical needs in violation of his constitutional rights.  However, the Court found that Defendants Adams, Baker, Sanders, SHP, Strode, and Wilson were each entitled to summary judgment on account of Plaintiffs' failure to produce sufficient evidence to demonstrate a constitutional violation.  As bad faith requires proof of a violation of a constitutional right that was clearly established at the time, the facts in the light most favorable to Plaintiffs demonstrate bad faith on the part of Defendant Price that negates qualified official immunity for any of her discretionary actions.

**C. Motions for Sur-Reply**

Plaintiffs have moved to file Sur-Replies to the SHP Defendants' Motion for Summary Judgment [DN 125] and the County Defendants' Motion for Summary Judgment [DN 130].  The County Defendants' have filed a Response to the Sur-Reply [DN 131].  The Court **GRANTS** both of Plaintiffs' Motions to file a Sur-Reply.

48

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Dr. John Adams' Motion for Summary Judgment [DN 108] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to all of Plaintiffs' § 1983 claims and outrage claim, and is **DENIED** as to Plaintiffs' negligence and gross negligence claims.

**IT IS FURTHER ORDERED** that the County Defendants' Motion for Summary Judgment [DN 110] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to Plaintiffs' outrage claim and Eighth Amendment and Tenth Amendment § 1983 claims against all County Defendants; as to Plaintiffs' Fourteenth Amendment § 1983 claim against Defendants William Baker, Derrick Sanders and Jackie Strode; and as to Plaintiffs' negligence and gross negligence claims against Defendants Derrick Sanders and Jackie Strode. It is **DENIED** in all other respects.

**FURTHER** that the SHP Defendants' Motion for Summary Judgment [DN 113] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to Plaintiffs' outrage claim and Eighth Amendment and Tenth Amendment § 1983 claims against all SHP Defendants; and as to Plaintiffs' Fourteenth Amendment § 1983, negligence, and gross negligence claims against Defendants Southern Health Partners and Cheryl Wilson. It is **DENIED** in all other respects.

**FURTHER** that Plaintiffs Motion for Leave to File Sur-Reply [DN 125] and Motion for Leave to File Sur-Reply [DN 130] are **GRANTED**.

*Joseph H. McKinley*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

July 27, 2012

cc: counsel of record

49